```
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

MARY GALIOTTI,

                    Plaintiff,             05-CV-6542

v.                                         DECISION
                                           and ORDER
JO ANNE BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.

_____
```

INTRODUCTION

Plaintiff, Mary Galiotti ("plaintiff" or "Galiotti"), filed this action seeking review of a final decision by the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under the Social Security Act ("the Act"). Jurisdiction to review the Commissioner's decision arises under 42 U.S.C. § 405(g). On October 17, 2005 the plaintiff moved for judgment on the pleadings. On January 13, 2006, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, the Commissioner moved for judgment on the pleadings affirming her final decision that the plaintiff was not eligible for DIB.

For the reasons that follow, this Court finds that the Commissioner's decision is supported by substantial evidence. Accordingly, the defendant's motion for judgment on the pleadings is granted.

PROCEDURAL HISTORY

Galiotti allegedly became disabled on December 14, 2000 due to permanent carpal tunnel syndrome (CTS) in both hands. After unsuccessfully applying for DIB in 2001, she reapplied on March 13, 2003. (T. 107-109)[1]. After denial of her application (T. 75-78), Galiotti filed a request for a hearing before an Administrative Law Judge (ALJ). (T. 79). The hearing was held via teleconference on May 20, 2005 (T. 32-72). Galiotti appeared with counsel and testified. The ALJ subsequently denied her application on July 28, 2005. (T. 17-31). On September 21, 2005, the ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Galiotti's request for review. (T. 4-6). Thereafter, Galiotti filed this action on October 17, 2005 appealing the ALJ's decision pursuant to 42 U.S.C. § 405(g).

BACKGROUND

A. Non-Medical Evidence and Hearing Testimony

Mary Galiotti was born on April 29, 1967 and is a 39-year-old divorced mother of three. (T. 35-36). She lives in an apartment with her three children and her sister's two children. (T. 36). She is able to cook, clean, do the laundry and grocery shop, although her children help her. (T. 50-51). She currently does not have a driver's license because she had a DWI conviction in 2004.

---

[1] All citations "T" refer to the Transcript of the Administrative Record submitted to the Court as part of the defendant's Answer which include, *inter alia*, plaintiff's medical records, a transcript of the hearing before the ALJ and copies of the ALJ's decision denying plaintiff DIB.

(T. 37). She has taken Celexa for depression since 2001. (T. 233). Although she denies alcohol and tobacco abuse, there is some evidence in her medical record that such abuse exists. (T. 37-38, 261). Galiotti is 5' 7" tall and weighs 144 pounds. (T. 35). She recently lost 30 pounds by exercising on a treadmill. (T. 36). Galiotti has a high school education. (T. 38). She has worked as a waitress, a bar manager and a produce clerk and was working as a production control manager when she became disabled on December 14, 2000. (T. 40-42. 134). After her second right hand carpal tunnel release surgery, she returned to work for about a week, but was laid off. (T. 203). There is no indication in the record as to why she was laid off. Since then she completed a nail tech course in 2001 although she failed to get her manicure license because her hands were still painful. (T. 39, 139). She also had a failed work attempt selling Tupperware products door-to-door in 2002. (T. 39-40). She then completed one semester of college in 2003 toward a criminal justice associate's degree but failed to complete her required studies. (T. 38, 175). Most recently she attended the Vocational and Educational Services for Individuals with Disabilities (VESID) but was unable to take her own notes during class. (T. 54-55). VESID was unsuccessful at placing her as an alarm monitor at a security systems company. (T. 55).

    B. <u>Medical Evidence</u>

    Galiotti's CTS began in 1987. (T. 216). Dr. Arlen Snyder, an orthopedic surgeon, performed a right carpal tunnel release surgery

on Galiotti in August of 1987 and continued to treat her until 1989. (T. 212-216). Galiotti's symptoms returned in 1997, and Dr. Snyder referred her to Dr. Knapp, a neurologist, for a nerve conduction test. (T. 210-211). Dr. Knapp performed a nerve conduction test on both of her hands on February 15, 2000. He concluded that "the right CTS seem[ed] to have resolved clinically and electrodiagnostically" but that "[t]here continue[d] to be evidence of a left CTS that has been associated with some mild worsening." (T. 272).

Despite the results of the nerve conduction studies, Galiotti indicated to Dr. Snyder in a follow up appointment that she had more symptoms in her right hand than in her left. (T. 209). Dr. Snyder performed a right carpal tunnel release surgery on Galiotti on October 25, 2000. (T. 219). Four weeks after her surgery she was doing "quite well." (T. 204). She returned to work in December, 2000 but was "laid off" a week later and was not working at that time. (T. 203).

At an October 16, 2001 appointment with Dr. Snyder, Galiotti complained of recurrent right CTS symptoms. (T. 201). Examination was remarkable for positive Tinel's and Phalen's signs. Dr. Snyder referred Galiotti to Dr. Knapp for a repeat nerve conduction test. (T. 199). Dr. Knapp's report from January 4, 2002 revealed no abnormality of the right hand. (T. 273).

Dr. Snyder completed a Medical Examination for Employability Form on December 21, 2001. (T. 268-269). He reported that Galiotti

had no limitations in walking, standing, sitting, seeing, hearing, speaking or climbing stairs. She did have moderate limitations in lifting, carrying, pushing, pulling and bending and was very limited in using her right hand. On February 26, 2002 Dr. Snyder reported that "she is employable as long as she does not have to use her right hand very much." (T.197).

Dr. Snyder referred Galiotti to Dr. Jeffrey Jones, an orthopedic surgeon, for a second opinion. (T. 198). Dr. Jones saw Galiotti on March 6, 2002 and concluded that "she should avoid highly repetitive grip and grasp activities, should do self-paced activities and avoid activities requiring a high degree of dexterity as well as exposure to vibratory tools and marked temperature changes, particularly any cold or damp." (T. 224-225). He felt Galiotti could benefit from left carpal tunnel release surgery, but felt that the right would not benefit from a third surgery.

Galiotti returned to Dr. Snyder in July of 2002 for continued bilateral CTS symptoms. (T. 195). Examination showed positive Tinel's and Phalen's signs bilaterally. Dr. Snyder once again referred Galiotti to Dr. Knapp for a repeat nerve conduction test. Dr. Knapp's report from March 4, 2003 showed evidence of left CTS. (T. 245-246). On May 30, 2003 Dr. Snyder performed a left carpal tunnel release surgery on Galiotti. (T. 191).

On June 10, 2003, Dr. Snyder reported that Galiotti was "healing nicely," could "move her fingers well" and had "good range

of motion of her wrist." (T. 191). On August 7, 2003 Dr. Snyder indicated to Galiotti that she "certainly is not totally disabled." (T. 240). Galiotti's last visit to Dr. Snyder was on October 16, 2003. (T. 190). At that time she indicated that she had some discomfort, tingling and numbness bilaterally and dropped things occasionally. Dr. Snyder indicated that she had somewhat decreased grip strength bilaterally and suspected that "she is going to be very limited in any kind of activity which requires forceful use of her hands or even a lot of repetitive activity." He also reported that no further treatment of Galiotti was indicated.

On May 20, 2004 Galiotti had an appointment with Dr. Jones for a second opinion of her left CTS. (T. 263-265). Dr. Jones reported that both of Galiotti's wrists were remarkably the same. She had well-healed incisions, but both were sensitive to touch. She did not have any neuromatous findings on either side. Her wrist flexion was difficult to examine because of numbness and tingling, but she exhibited symmetric range of motion on both sides. There was no evidence of thenar atrophy, no truly positive Tinel's sign and very modest tenderness at the cubital tunnel on the left, with no focal atrophy. Dr. Jones felt that unless Galiotti had a second surgery on her left hand, she had reached maximum medical progress on both hands and would need to accept her level of symptoms as they were.

Galiotti was also evaluated on several occasions by consultative physicians. On March 28, 2002 Dr. John Devanny, a

Workers' Compensation doctor, found that she demonstrated a "temporary partial disability of a moderate degree regarding her bilateral wrist and hand symptoms." He also concluded that "she would be capable of working at this time. However, she would have to have a restriction of no repetitive grasping or lifting with her hands. She should avoid repetitively lifting items weighing greater that 15 pounds." (T. 227-231).

On July 30, 2002 Dr. Roy Hepner, a Workers' Compensation orthopedic surgeon, concluded that Galiotti had mild left carpal tunnel syndrome but "the patient does not appear to have a disability with respect to her left hand." (T. 232-235).

On April 29, 2003 Dr. Samuel Balderman, consultative internal medicine specialist for the Social Security Administration concluded that Ms. Galiotti "has moderate limitations in the use of the hands for gross motor function and for frequent repetitive motion due to bilateral carpal tunnel syndrome." (T. 247-250).

Dr. Donovan Holder is a pain management specialist who saw Galiotti on four occasions in 2004 and 2005. (T. 266-267, 287-294). He determined that she had "bilateral hand pain, questionable etiology" and prescribed Trazodone to help her sleep and Celebrex as an anti-inflammatory, which he later changed to Naprosyn and then to Lodine. (T. 266-267, 287). When her pain continued he gave her Darvocet and Neurontin for pain relief. (T. 288). In his Detailed Reaching, Handling and Fingering Residual Functional

7

Capacity Questionnaire from May 20, 2005, Dr. Holder determined that her pain would frequently interfere with her attention and concentration; that she could never lift 50 pounds, rarely lift 20 pounds and occasionally lift 10 pounds; that she should limit her reaching, handling or fingering to 4 hours during an 8-hour day; that she could occasionally reach at, below or above shoulder level but rarely perform fingering or handling; that she should avoid changes in temperature and vibrations; and that she would most likely miss more than 4 days per month as a result of her impairment or treatment. (T. 289-292).

In his physical examination of Galiotti, however, Dr. Holder determined that her motor and sensory exams were normal; there was no evidence of complex regional pain; she had full range of motion of her bilateral upper extremities; and she had no evidence of lesions, muscle atrophy, nail changes or temperature changes to her hands. He also noted that her examination was unremarkable, except for a positive Tinel's sign on the right wrist only. (T. 266).

On one occasion Ms. Galiotti experienced acute head pain for two weeks and went to the emergency room of Clifton Springs Hospital & Clinic at 11:30 p.m. on April 30, 2003. (T. 252-255). The examining physician noted that she smelled of alcohol and discharged her with instructions to follow-up with Dr. Knapp. (T. 255). Dr. Knapp concluded that Ms. Galiotti was in all likelihood experiencing benign coital headaches and suggested an

8

MRI as a follow-up, but it was never completed. (T. 256). Dr. Knapp prescribed Naproxen (Aleve) to be used on an as-needed basis.

## LEGAL STANDARD

### A. Jurisdiction and Scope of Review

42 U.S.C. § 405(g) grants jurisdiction to district courts to hear claims on the denial of Social Security benefits. When considering a claim, the Court must accept the findings of fact made by the Commissioner provided that such findings are supported by substantial evidence in the record. Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938).

Under this standard, the court's sole inquiry is "whether the record, read as a whole, yields such evidence as would allow a reasonable mind to accept the conclusions reached by the law judge." Sample v. Schweiker, 694 F.2d 639,642 (9th Cir. 1982).

### B. Legal Standards

The plaintiff maintains that she is entitled to DIB benefits as provided in Title II of the Act. See 42 U.S.C. § 423(d). Entitlement to benefits under the Act is conditioned upon compliance with all relevant requirements of the statute.

To be entitled to DIB, a claimant must meet the insured status requirements of 42 U.S.C. § 423(c). A claimant must also

demonstrate the inability to engage in a substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A).

Furthermore, a claimant is disabled only if his impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  42 U.S.C. § 423(d)(2)(A); see 20 C.F.R. § 404.1520.

In evaluating disability claims, the Commissioner instructs adjudicators to follow the five step process promulgated in 20 C.F.R. 404.1520.  First, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity.  Second, if the claimant is not so engaged, the Commissioner must determine whether the claimant has a "severe impairment" which significantly limits his ability to work.  Third, if the claimant does suffer such an impairment, the Commissioner must determine whether it corresponds with one of the conditions presumed to be a disability by the Social Security Commission.  If it does, then no further inquiry is made as to age, education or experience and the claimant is presumed to be disabled.  If the impairment is not the equivalent of a condition on the list, the fourth inquiry is

whether the claimant is nevertheless able to perform his past work. If he is not, the fifth and final inquiry is whether the claimant can perform any other work. The burden of proving the first four elements is on the claimant, while the burden of proving the fifth element is on the Commissioner. <u>Bush v. Shalala</u>, 94 F.3d 40, 45 (2d Cir. 1996).

## DISCUSSION

Here, the ALJ properly followed the five step procedure. The ALJ found that the plaintiff: (1) had not engaged in substantial gainful activity since the alleged onset of disability; (2) suffered from bilateral CTS and chronic headaches that are considered "severe," based on the requirements in the Regulations at 20 C.F.R. § 404.1520(c); (3) did not have an impairment meeting or medically equivalent to one of the listed impairments in Appendix 1 of the C.F.R., Subpart P, Regulations No. 4; (4) is unable to perform any of her past relevant work as a production control manager, waitress, bar manager or a produce clerk but could perform work meeting the residual functional capacity for less than the full range of sedentary work; and (5) showed that there were a significant number of jobs in the national economy which she could perform. (T. 20-31).

The Commissioner contends that because there is substantial evidence in the record to support the ALJ's determination that the

plaintiff is not disabled, her motion for judgment on the pleadings should be granted.

The plaintiff contends that although the ALJ followed the five step procedure, he improperly concluded that she was not disabled. Specifically, the plaintiff argues that the ALJ erred when he (1) failed to afford controlling weight, or at least greater weight, to the opinion of Dr. Holder; (2) evaluated her residual functional capacity; (3) relied upon testimony from the vocational expert; and (4) failed to make a proper credibility assessment of Galiotti's testimony. Therefore, the plaintiff argues that because the ALJ erred, the determination should be reversed or in the alternative, it should be remanded to require the ALJ to apply the proper legal standards in weighing the evidence. This Court finds that there is substantial evidence in the record to support the ALJ's determination that the plaintiff is not disabled.

The ALJ did consider the opinion of Dr. Holder. However, an ALJ will give controlling weight to the opinions from treating sources only if they are well supported by acceptable medical evidence and are not in conflict with any other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2).

Here, it was reasonable for the ALJ to give little evidentiary weight to Dr. Holder's opinion that Galiotti would likely be absent from work more than four days out of the month. This opinion is not supported by the medical records and reported limitations from

12

the other doctors in the record nor even by Dr. Holder's own physical examination of the claimant.  Dr. Holder's own physical examination of the plaintiff was unremarkable, except for a positive Tinel's sign in the right wrist only. (T. 266).  Otherwise she had full range of motion of her upper extremities and no evidence of lesions, muscle atrophy, nail changes or temperature changes to her hands.  Her motor and sensor exams were normal, and the only diagnosis was bilateral hand pain, questionable etiology. Dr. Snyder had indicated to Galiotti that she "certainly is not totally disabled" (T. 240) but suspected that "she is going to be very limited in any kind of activity which requires forceful use of her hands or even a lot of repetitive activity." (T.190). Dr. Jones concluded that Galiotti was not disabled from all work activity but should avoid highly repetitive grasp and grip activities, should do self-paced activities and avoid vibratory tools and marked temperature changes. (T. 224).  Dr. Devanny reported that Ms. Galiotti was capable of working so long as she did not engage in repetitive gripping and grasping activities or lift items weighing more than 15 pounds. (T. 231).  Dr. Balderman opined that Galiotti would have moderate limitations in the use of her hands and for frequent repetitive motion. (T. 249).  No doctor besides Dr. Holder, however, concluded that Galiotti would miss any days of work due to her impairments.

The reason for giving controlling weight to treating physicians is because "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence..." 20 C.F.R. 404.1527(d)(2). Dr. Holder saw Ms. Galiotti a total of four times in 2004 and 2005. (T. 266-267, 287-294). He prescribed her pain medication and changed her prescription twice. Such a relationship is not one that can provide a "detailed, longitudinal picture" of Ms. Galiotti's bilateral carpal tunnel syndrome, which began in 1987. Fortunately in this case there is a physician who has had a more extensive relationship with Ms. Galiotti. Dr. Snyder treated Ms. Galiotti on multiple occasions between 1987 and 1989 and between 1997 and 2003. (T. 190-222, 240-243, 257-261). He concluded that Ms. Galiotti "certainly is not totally disabled" (T. 240) but that "she is going to be very limited in any kind of activity which requires forceful use of her hands or even a lot of repetitive activity." (T. 190). Thus, it was reasonable for the ALJ to discount the part of Dr. Holder's testimony that was inconsistent with the medical record as a whole as well as his own examination of the patient.

The plaintiff alleged that the ALJ erred when he evaluated her residual functional capacity. The ALJ determined that Galiotti

> retains a residual functional capacity for less than the full range of sedentary work. While sedentary work is defined as work which involves sitting, a certain amount

14

>   of walking and standing is often necessary in carrying
>   out job duties.  The claimant can only lift 10 pounds; is
>   limited in push/pull of upper extremities; is limited to
>   occasional reaching and feeling with the dominant hand;
>   should avoid concentrated exposure to cold and wetness;
>   and has a moderate limitation in her ability to
>   concentrate, maintain attention for extended periods, and
>   keep up a pace, as a function of pain.

(T. 27). This conclusion is supported by the plaintiff's subjective complaints as well as medical evidence in the record. Galiotti testified that she can lift up to five pounds, walk, stand, sit, bend at the waist, push or pull with her arms or hands, reach overhead and climb stairs. (T. 46-47). She complained of numbness, spontaneously dropping things and pain when writing. (T. 47-48). Her doctors also found no limitations in walking, standing, sitting or climbing stairs and limitations only in "activity which requires forceful use of her hands or even a lot of repetitive activity" (T. 190). She "would have to have a restriction of no repetitive grasping or lifting with her hands. She should avoid repetitively lifting items weighing greater that 15 pounds." (T. 227-231). The ALJ's residual functional capacity evaluation takes into account both Galiotti's subjective complaints as well as her doctors' medical opinions.

Galiotti also argues that the ALJ improperly relied upon testimony from the vocational expert. However, the ALJ did not err in his reliance upon the testimony from the vocational expert. A surveillance system monitor position and an information clerk position as suggested by the vocational expert meet Ms. Galiotti's

15

"residual functional capacity for less than the full range of sedentary work" and the information clerk include her "transferable skills." (T. 63-64). The ALJ may rely upon a vocational expert's testimony as to the existence of jobs which the plaintiff can perform. Dumas v. Schweiker, 712 F.2d 1545, 1553-54 (2d Cir. 1983). The ALJ and Ms. Galiotti agree that the vocational expert was qualified. (T. 30). Therefore, the ALJ properly relied on the vocational expert's testimony.

Finally, the ALJ did not fail to make a proper credibility assessment of Galiotti's testimony. The ALJ found Galiotti to be "credible to the extent that she is precluded from performing work requiring a higher residual functional than for less than the full range of sedentary work..." (T. 28). Galiotti's statement that she would most likely have 7 to 8 bad days per month in the wintertime due to the cold, damp weather is not supported by the medical record as a whole. (T. 60).

Furthermore, the ALJ noted that Ms. Galiotti stopped working in 2001 not because of her disability but because she was "laid off." (T. 203). Therefore, I find that the ALJ's decision is supported by substantial evidence in the record and that the record, read as a whole, presents sufficient evidence to support the conclusions of the ALJ.

CONCLUSION

For the reasons set forth, I do find substantial evidence in the record to support the ALJ's conclusion that the plaintiff is not eligible for DIB. Accordingly, the Commissioners's motion for judgment on the pleadings is granted.

ALL OF THE ABOVE IS SO ORDERED.

S/Michael A. Telesca

_____
         MICHAEL A. TELESCA
       United States District Judge

DATED:   Rochester, New York
         July 5, 2006